UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| LONDON TRUST MEDIA, INC., | ) | |
| an Indiana corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.   1:17-cv-01244 |
| | ) | |
| | ) | |
| SERVER SITTERS, LLC, | ) | |
| a Virginia Limited Liability Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff London Trust Media, Incorporated ("LTM") hereby files this Complaint against

Defendant Server Sitters, LLC ("Server Sitters" or "Defendant"):

## I.   INTRODUCTION

1.     Plaintiff LTM is the sole owner of "Private Internet Access" ("PIA"), a pioneering

and popular subscription-based Virtual Private Network ("VPN"), founded nearly a decade ago,

through which customers securely and anonymously access the Internet for a nominal monthly,

semi-annual, or annual fee.  PIA's proprietary network and software enables its customers to

access the Internet through an encrypted "tunnel" created between a customer's device and PIA's

servers.  Since PIA's 2010 launch, consumer-facing VPN service providers have proliferated as a

growing number of individual consumers have become educated about the Internet and more

protective of their online security and privacy.  As such, the consumer-facing VPN service

1

provider business is increasingly competitive.  In the face of such competition, PIA has remained an industry leader.

2.     As consumer VPNs have gained broader appeal over the past few years, and additional fee-for-service VPN providers have entered the marketplace, PIA has been consistently ranked among the best and most cost-effective VPN providers by respected industry publications and journals, independent bloggers, and consumers.  For instance, on September 6, 2017, a respected industry publication, c/net.com, published an article titled, "The Best VPN Services of 2017," in which it designated PIA as one of only three "five-out-of-five" point VPN service providers, highlighting its low yearly-price and "excellent performance."  (*See* https://www.cnet.com/best-vpn-services-directory, *archived at* http://perma.cc/6Z88-3VU5). Similarly, PCmag.com currently designates PIA as an "editor's choice" VPN, giving it a rating of 4½ out of 5, and likewise designating it as "excellent."  (*See* https://www.pcmag.com/article2/0,2817,2414799,00.asp, *archived at* http://perma.cc/ZN38-7H3Y).

3.     Prompt and knowledgeable customer service is an important element in the competitiveness and success of VPN service providers.  Within two years of its launch, PIA's customer base had grown to the point where, LTM concluded, PIA could best meet its customers' needs, while sustaining company growth, by outsourcing the customer support function to a specialist.  Accordingly, on or about September 10, 2012, LTM entered into a Service Level Agreement with Defendant Server Sitters to provide PIA with customer support services (the "September 2012 Agreement").  As discussed more fully below, Server Sitters had held itself out to the public in general and LTM in particular as an Internet industry expert in supplying outsourced customer support.  Thereafter, LTM and Server Sitters twice executed revised Service

Level Agreements: on or about December 19, 2013 (the "December 2013 Agreement") and on or about February 18, 2016 (the "February 2016 Agreement" or the "Agreement").

4.      On or about April 30, 2017, LTM terminated its most recent contract with Server Sitters—the February 2016 Agreement—for cause, because Server Sitters had materially failed to perform a number of its obligations under the Agreement.  **A copy of the February 2016 Agreement is attached hereto as Exhibit A.**  LTM has since discovered that, in addition to materially breaching the Agreement, Server Sitters fraudulently overcharged LTM (and LTM paid) hundreds of thousands of dollars for *at least one hundred and eighty months of man-hours of work that Server Sitters never performed under that contract.*  Plaintiff LTM brings this action seeking actual and punitive damages, attorneys' fees and costs for (1) breach of contract; (2) fraud; and (3) conversion.

## II.      PARTIES

5.      Plaintiff LTM is a corporation duly organized and existing under the laws of Indiana, with its principal place of business in Denver, Colorado.

6.      Defendant Server Sitters is a Limited Liability Company registered in the Commonwealth of Virginia.  The Commonwealth of Virginia's State Corporation Commission records list Server Sitters' registered agent as Paul Schoolfield, who is, upon information and belief, Server Sitters' Chief Executive Officer and sole member.  Paul Schoolfield is also a citizen of the Commonwealth of Virginia and, upon information and belief, currently resides in Stafford County.  According to the Commonwealth of Virginia's State Corporation Commission website, Server Sitters' Virginia office is located at 4 Still Spring Ct., Fredericksburg, VA 22406.

### III.   JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs, and the controversy is between citizens of different states such that there is complete diversity among the parties.

8.      This Court has general personal jurisdiction over Server Sitters because it is an LLC registered in and duly authorized under the laws of the Commonwealth of Virginia, whose sole member is Paul Schoolfield, a Virginia citizen.  In addition, this Court has specific jurisdiction over Server Sitters because it agreed to submit to the jurisdiction of this Court under the February 2016 Agreement executed by and between Server Sitters and Plaintiff.  That Agreement, drafted by Server Sitters, is central to this dispute; and in this suit, Plaintiff alleges claims for breach of the Agreement, fraudulent overcharges made by Server Sitters under the Agreement, and conversion of Plaintiff's property to which Server Sitters had access through the Agreement.

9.      Venue lies in this judicial district, and in the Alexandria Division of this judicial district, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District and Division.  In addition, Defendant Server Sitters is a Virginia LLC with registered offices in this District and Division.  Also, the February 2016 Agreement that is the subject of this action contains a forum selection clause, which states, "The exclusive jurisdiction and venue for any disputes arising out of this Agreement shall be the federal or state courts located in Stafford, Virginia, and all parties hereby consent to personal jurisdiction and venue therein."

## IV.   **FACTUAL BACKGROUND**

10.     LTM's current chairman, Andrew Lee, together with a co-founder, launched PIA in August 2010 as a self-funded start-up business, developed the PIA network and application software, and initially ran PIA from a suburban-Indiana home owned by Mr. Lee's parents.  Over the past seven years, Mr. Lee has grown the company into an industry leader in providing online privacy and security to consumers and into a financially thriving enterprise.  Currently, PIA is one of the world's largest and most trusted consumer-facing VPN's.

11.     While connected to PIA's VPN, a customer's data flows, encrypted, through PIA's secure tunnel and exits from PIA's remote server to the Internet.  PIA thus protects its customers from privacy intrusions and vulnerabilities associated with using public Wi-Fi networks (e.g., "snooping" and "hijacking" of an individual's online session, implantation of malware, and thefts of personal data); prevents tracking of its customers' online activities by Internet Service Providers (who are allowed, by federal law, to sell their own users' data to third-party advertisers without permission); and secures the privacy of its customers' Internet searches (by masking customers' Internet Protocol addresses).

12.     PIA has developed a proprietary network and business model through which it provides its customers with secure Internet access through over 3,400 servers spread over thirty countries, boasting the largest volume of servers with the greatest geographic diversity of any VPN service provider.  PIA's proprietary configuration of thousands of servers located across the globe is managed by confidential and proprietary software developed by PIA, ensuring that its thousands of linked servers run efficiently and securely in providing reliable, private Internet connections to its customers across the United States and the world, twenty-four hours a day, seven days a week, three hundred sixty-five days a year.

13.     For the first two years of PIA's existence, Mr. Lee managed all of PIA's customer service needs singlehandedly: he had established a customer service email address and personally responded to each and every PIA customer inquiry or concern regarding PIA via email, dedicating virtually every waking hour to PIA customer support.  By fall 2012, PIA's customer base was growing to the point where Mr. Lee, working around the clock, could not continue to personally resolve each and every customer service inquiry or cover PIA's customer service inquiries alone.  At that time, LTM determined that PIA could best meet its growing customer demand, while still maintaining uncompromised focus on providing the highest-level of Internet security and privacy, by outsourcing this discrete customer service function to a qualified contractor.  LTM understood that finding a qualified customer support partner was crucial to PIA's success.  Mr. Lee conducted research to find a qualified company and discovered Server Sitters referenced in some online industry forums.  He then visited Defendant Server Sitters' website, on which Server Sitters held itself out as the most qualified company of its kind.

14.     Specifically, on its website and in online trade forums, Server Sitters held itself out as being an Internet industry-leader in outsourced customer service and distinguished itself as being the only such company wholly based in North America.  Presently, Server Sitters' website states, "Server Sitters is the leader in Outsourced Customer Service and Process Management. This includes data entry, client intake, as well as both inbound and outbound customer service." (*See* https://serversitters.com, *archived at* https://perma.cc/YWV2-LCWX).   Server Sitters' website describes its service as follows:

> [I]f your support answers the phone faster, provides the right solution to the issue and does it in a friendly way, your . . . company will set itself ahead of the competition . . . Providing great customer service and support will build trust with your customers and keep them paying you month in and month out. . . . The cost of hiring your own support team can eat up your entire budget. However, if you

outsource the support to a company specializing in technical support for hosting companies, you gain an expert support team without the high price.

(*See id.*)

15.     Sometime prior to September 7, 2012, Mr. Lee spoke via telephone to Server Sitters' former CEO about retaining Server Sitters.  During that conversation and in subsequent communications, Server Sitters convinced Mr. Lee that it was capable of providing the high-quality customer support essential to PIA's success.  As a result and as indicated above, on or about September 10, 2012, LTM entered into a written Service Level Agreement with Server Sitters (the "September 2012 Agreement").

16.     The September 2012 Agreement commenced on September 10, 2012 for a three-month term, automatically renewable on a month-to-month basis at the option of the parties.  All three of Server Sitters' agreements with LTM classified Server Sitters' customer service agents into "tiers," based on its agents' skill levels and expertise.  Under the September 2012 Agreement, Server Sitters committed to supply PIA with 3 "Dedicated Tier 1 Technical Support" agents, priced at $2,800 per month each, for a contractual monthly total of $8,400.  The terms of the September 2012 Agreement expressly required that Server Sitters' Tier 1 agents would be capable of responding to basic PIA customer inquiries, including, but not limited to, responding to questions about how to configure PIA on all manner of electronic devices, trouble-shooting and helping customers with connectivity issues, answering questions about PIA security and encryption, and responding to inquiries about PIA subscription plans, enrollment, cancellation, and basic billing concerns.  The initial term of the September 2012 Agreement expired on or about December 6, 2012, after which the September 2012 Agreement remained in force on a month-to-month basis through December 2013.

17.     On or about December 19, 2013, LTM and Server Sitters signed a new Service Level Agreement (the "December 2013 Agreement"), with a commencement date of January 1, 2014, for a twelve-month term.  The December 2013 Agreement added staff and increased pricing. Specifically, Server Sitters agreed to provide 6 dedicated Tier 1 agents per month (an increase of three, doubling the amount of Tier 1 agents assigned) at a cost of $3,010.70 each, one of whom was to be billed at a "discount" of $2,910.70 per month, plus 4 more senior and more expensive employees:  a single "Technical Manager" at a cost of $3,992.58 per month; a single "Senior Tier 2 Technical Support" agent at a cost of $3,992.58 per month; and 2 "Tier 2 Technical Support" agents at a cost of $3,852.24 each per month.  Thus, the total dedicated monthly service cost of the services supplied by Server Sitters per the December 2013 Agreement was $33,513.50.  The initial term of the December 2013 Agreement expired on or about January 1, 2015, after which that Agreement remained in force on a month-to-month-basis.

18.     On or about February 18, 2016, LTM and Server Sitters signed a third Service Level Agreement—the one at issue in this case.  This Agreement, comprised of seven numbered provisions and subparagraphs, plus lettered Schedules A through G, was for a twenty-four month period, with a commencement date of March 1, 2016.  The February 2016 Agreement was modified significantly from the December 2013 Agreement, which, among other things, resulted in a dramatic increase in the contract price for Server Sitters' monthly dedicated support service costs.

19.     Under Section 2.0 and Schedules A through G of the February 2016 Agreement, Server Sitters was to supply 27, full-time Tier 1 agents ($3,010.70 each per month); a "bench" of 3 full time Tier 1 agents at $0 per month to LTM; 1 Team Lead Support agent ($3,852.24 per month); and 4 Tier 2 agents ($3010.70 each per month).  Server Sitters also added, to the February

8

2016 Agreement, twelve people to entirely new job functions that did not exist for the four previous years during which Server Sitters was supplying customer support services to LTM. Specifically, Schedule F of the February 2016 Agreement added 2 "Senior Tier 3 Technical QA Support" agents ($3,992.58 each per month), and 4 agents and 6 supervisors to a "Specialized Department" addressing "Social Media and Retention" ($3,010.70 each per month). The cost of these twelve new positions alone totaled $38,092.16 per month—more than the entire monthly value of the parties' previous two Service Level Agreements (*i.e.,* the September 2012 Agreement and the December 2013 Agreement). The total monthly price (absent contractually applicable discounts, discussed below) for Server Sitters' dedicated support services under the February 2016 Agreement was $141,899.57.

20.     Under Schedule B of the February 2016 Agreement, Tier 2 agents were responsible for, among other things, working on customer service issues "escalat[ed]" to them by Tier 1 agents unable to solve the escalated issues; reporting on "trending" customer service issues; "gathering examples for administration of global [customer service] issues"; and, examining and analyzing debug logs. Under Schedule D, the Tier 3 Technical Quality Assurance Support agents were responsible for, among other things, serving as the points of contact on all issues relating to technical support services, billing services, and "advanced support and quality services," and for reporting on the performance of individual agents. Schedule D required the Quality Assurance Support agents to "monitor Server Sitters Agents to ensure that pre-determined standards of service" were "being consistently met," and to "coach and/or train staff in areas where improvement or change [was] deemed necessary."

21.     In Schedule F of the February 2016 Agreement, Server Sitters charged a 5% "mark-up," at the price of $6,763.81 per month, for "Staff and Account Management."  Neither of the two previous Service Level Agreements contained this or any similar mark-up.

22.     Schedule G to the February 2016 Agreement stated that Server Sitters would apply a discount to the $141,899.57 monthly contract price, and that the discount percentage depended on the length of the Agreement's term.  Schedule G stated that if the Agreement's term was for twelve months, Server Sitters would apply a 7% discount, lowering the monthly total to $131,966.60.  If the term was for twenty-four months, Server Sitters would apply a 10% discount, lowering the monthly total to $127,709.61.  Despite the twenty-four month contract term, Server Sitters never applied a 10% discount to any of its invoices, in breach of the February 2016 Agreement.

23.     Schedule G also required Server Sitters to engage LTM in the selection and hiring of new agents who were to work for Server Sitters on PIA customer support.  Specifically, Schedule G states, "[i]n the event of the need to hire additional agents, Server Sitters, LLC agrees to notify [LTM] of prospective agent skills and to provide resumes or work history for prospective agents considered ideal by Server Sitters, LLC.  Server Sitters, LLC agrees to allow [LTM] the right to refuse when considering a new hire agent for the project."

24.     In fact, Server Sitters did not provide LTM with prospective employees' resumes or work histories before Server Sitters hired agents, thus breaching its clear obligation under Schedule G.  Indeed, despite repeated requests from LTM, Server Sitters, through April 30, 2017, the date on which LTM terminated the February 2016 Agreement, *still* had failed to provide LTM with either a resume or a work history for seven employees for whom it was invoicing LTM: three Tier 1 agents, one Social Media Retention agent, two Team Leaders, and a Communications

10

Manager.  Of the thirty-six Server Sitters employees for whom Server Sitters, belatedly and in breach of Schedule G of the February 2016 Agreement, finally provided LTM with a resume or work history (*after hiring them*), five individuals, including a Social Media Retention agent, had no education beyond high school and had no technical support background, experience, or training at all.  For example, one individual with only a high school diploma had worked as a Domino's pizza cook, Walmart stock clerk, and security guard before Server Sitters hired him as a Tier 1 agent.  Furthermore, two additional individuals had diplomas (a certificate offered by Canadian vocational and technical schools, and community colleges) in electrical engineering but no customer service or technical support background.  For example, one had worked only as a cook at A&W before Server Sitters hired him as a Tier 1 agent, and another had worked as a cleaner, a cook at Wendy's, and a stock clerk before Server Sitters hired him as a Tier 2 billing specialist. Had Server Sitters followed the terms of the February 2016 Agreement, LTM would not have consented to Server Sitters hiring individuals with no relevant skills or education, no previous computer experience, no technological expertise, and no work experience in the Internet industry at all to work on PIA customer support, and would have exercised its contractual-right to refuse to pay, *at least three thousand dollars per month,* for those people to provide the specialized and professional customer service support that Server Sitters was contractually obligated to provide. A former Server Sitters executive advised LTM, in approximately September 2017, that Mr. Schoolfield was "hiring anyone off the street," then billing LTM for those agents at a premium rate that was generally higher than rates paid by any other Server Sitters customer.

25.     Under Section 2.3 of the February 2016 Agreement, Server Sitters was responsible for reimbursing LTM for certain events of "Network Downtime."  Network Downtime was defined as (1) a period of at least one hour for which a PIA customer's access to the Internet was

unavailable because of problems caused by Server Sitters' hardware or system software; and (2) "the time in which no Server Sitters agents or less agents than regularly scheduled are available at an agreed upon shift time for at least one (1) hour."

26.     Server Sitters also agreed, in Section 2.8 of the February 2016 Agreement, to compensate LTM "in the event one or more Server Sitters, LLC agents must call in sick, does not show up to their shift, or for some other reason is absent without an alternative agent to handle the shift during a work week."  Section 2.8 provided that LTM was to receive a "refund for one agents [sic] eight (8) hour shift, as determined by [Server Sitters], when Server Sitters, LLC are [sic] unavailable for four or more full hours (to be pro-rated in an event exceeding four hours) during a work week."

27.     In Schedule D of the February 2016 Agreement, entitled "Administrative Services," Server Sitters agreed to "provide time clock stats and a weekly schedule to [LTM] in regards to all current and future Agent shifts," a weekly schedule which "shall include anticipated absences requested by Agents and applicable substitutions as well as multiple agents to be "on-call" in the event of an unanticipated absence."

28.     In Schedule G of the February 2016 Agreement, Server Sitters agreed to provide "at **Zero Cost to [LTM]**" (emphasis original), a number of "Staff and Infrastructure Enhancement[s]," including, but not limited to, providing two weeks of mandatory network training to all Server Sitters' staff and providing two weeks of mandatory customer service training to all Server Sitters' staff.

29.     In Section 3.0 of the February 2016 Agreement, LTM agreed "to supply all necessary documentation, software, and licenses to perform normal technical support operations described in Schedules A though F" of the Agreement.  In Section 3.1, LTM agreed that LTM was

to bare all costs associated with the application software and associated upgrades necessary for performing the customer support services.  Further, in Section 4, the parties agreed that "the use of any software licenses associated with the applications of London Trust Media, Inc. shall be solely in the discretion of London Trust Media, Inc."

30.     Schedule E of the February 2016 Agreement set forth the "Service Applications and Parameters," which, among other things, required LTM to supply Server Sitters with one of an enumerated list of customer management software programs compatible with and capable of running on LTM's servers.  Pursuant to the terms of the Agreement, LTM purchased and Server Sitters used a customer support software called "Kayako" prior to the beginning of the Agreement's term (March 1, 2016) through July 1, 2016.  From July 1, 2016 through LTM's April 30, 2017 termination of the Agreement, LTM purchased licenses for a customer support software called "Zendesk," and Server Sitters handled customer support tickets on that system from July 1, 2016 forward.  In addition to owning the software licenses for the customer support software products, LTM also owned all of the PIA  customer data entered into both the Kayako and Zendesk databases by Server Sitters' agents for the sole purpose of providing support to PIA's customers.

31.     In Schedule C of the February 2016 Agreement, Server Sitters acknowledged that LTM had provided it with certain hardware "for the purposes of the present project," and agreed that Server Sitters had "no right, title, or interest" in LTM's property and that it must be returned "upon request by London Trust Media, Inc."   After LTM lawfully terminated the February 2016 Agreement on April 30, 2017, LTM and Server Sitters negotiated the return of LTM's property— including LTM's computer hardware and PIA's customer-related data.

32.     As part of that negotiation, Server Sitters' CEO, Schoolfield, assured LTM (first in a written email, dated May 8, 2017, and, second, in a sworn Declaration dated May 12, 2017) that

he, personally, and Server Sitters corporately, had returned all of LTM's hardware and proprietary data, including PIA's customer service database.  First, in his May 8, 2017 email, Schoolfield stated, "[i]n regards [sic] to data we don't store client data.  The Kayako system was shut down months ago and the servers were destroyed.  Additionally, we were providing no monitoring for them everything was done online via their new help desk solution Zen Desk."  As indicated above, Kayako and Zendesk are the two customer service software programs and databases that were licensed to Server Sitters to perform customer service support for PIA under the February 2016 Agreement.  In his May 12, 2017 Declaration (**attached hereto as Exhibit B**), Schoolfield swore, "under penalty of perjury of the laws of the United States," to the following facts, among others:

a.  "The term 'London Trust Data' includes any London Trust customer service related data or information related to Server Sitters performance of customer support services for London Trust" including all "identifying piece[s] of information specific to a given London Trust customer." (Ex. B, ¶ 16).

b.  "Server Sitters does not possess any London Trust Data [as defined above] and has not provided any London Trust Data to any third parties."  (Ex. B, ¶ 17).

c.  "I, in my personal capacity, do not possess any London Trust Data [as defined above] and have not provided any London Trust Data to third parties."  (Ex. B, ¶ 18).

d.  "[T]he Kayako server . . . was destroyed some time ago, [and other than on that server] Server Sitters has never stored any London Trust Data on any servers under its possession, custody, or control, [and] *has never made any 'backups' of London Trust Data*.  (Ex. B, ¶ 19) (emphasis added).

14

e.  "I, in my personal capacity, have never stored any London Trust Data on any servers under my possession custody or control, have never made any 'backups' of London Trust Data, or provided London Trust Data to any third parties."  (Ex. B, ¶ 20).

f.  "Server Sitters has no copies of any London Trust Data, including but not limited to, screen shots *or other preserved records of customer emails, customer user names, or the content of customer requests made via email or chat*, that Server Sitters obtained through live desktop monitoring or any other monitoring conducted during the performance of outsourced customer service for London Trust from September 2012 through April 30, 2017. . . ."  (Ex. B, ¶ 21) (emphasis added).

g.  I, in my personal capacity, have no copies of any London Trust Data, including but not limited to, screen shots *or other preserved records of customer emails, customer user names, or the content of customer requests made via email or chat*, that Server Sitters obtained through live desktop monitoring or any other monitoring conducted during the performance of outsourced customer service for London Trust from September 2012 through April 30, 2017.  (Ex. B, ¶ 22) (emphasis added).

h.  "I acknowledge that any London Trust Data . . . if disclosed to any third party without the express knowledge and consent of London Trust, would likely harm London Trust's business and financial interest."  (Ex. B. ¶23).

33.  Despite Schoolfield's May 8, 2017 email and May 12, 2017 sworn Declaration stating unequivocally that Server Sitters had "destroyed" the Kayako server (which was used to host the entire PIA customer service database for several years), and that there were no backups whatsoever of any of this data, in October 2017, Schoolfield texted LTM's CEO, Ted Kim, a series

15

of messages focused on Schoolfield's effort to extort an unwarranted and unlawful cash payment from LTM, in which Schoolfield revealed that his prior email and sworn Declaration were false (*i.e.*, he revealed that he had *not* destroyed the data as he had represented under oath). And, he tried to "trade" LTM's proprietary customer information in exchange for cash.

34. Specifically, on or about October 18, 2017, Schoolfield texted Mr. Kim, offering him a job and attempting to turn him against LTM and Mr. Lee (whom Schoolfield called a "psycho"). Mr. Kim did not respond. Several days later, on October 26, 2017, Mr. Schoolfield texted Mr. Kim an "offer" (unrelated to the purported offer of employment) that Mr. Schoolfield would "give [Mr. Kim] everything on" LTM's former CEO with whom Schoolfield had attempted to conduct business in secret, in an effort to compete with and harm LTM, in exchange for the sum of $125,000. Mr. Kim, naturally, did not respond to this "offer" either. Frustrated at his multiple unsuccessful efforts to extort money from LTM and Mr. Lee, on October 26, 2017, Schoolfield texted Mr. Kim, stating that Schoolfield has a *"complete copy of your support client list and all helpdesk tickets."* (emphasis added). Schoolfield told Mr. Kim, "[w]e should talk," and claimed, "[s]omehow we ended up with a full kayako helpdesk backup," "[w]ith data on hundreds of thousands of clients." Schoolfield asked, "[w]ant me to send you some of the client data for proof?"

35. Mr. Schoolfield's above-described texts from October 2017 reveal that not only is Schoolfield's May 12, 2017 sworn Declaration false, Server Sitters is in breach of the February 2016 Agreement, including Schedule C, for its failure to return LTM's PIA customer service database and any other PIA-related customer data. Schoolfield and Server Sitters have improperly retained that data despite executing a sworn declaration several months ago that all LTM property, including all data and any back-ups of data, had been returned and/or destroyed.

16

36.     In Section 5.1 of the February 2016 Agreement, entitled "Fees and Payment," LTM agreed "to pay Server Sitters, LLC the amounts specified in this document and in future invoices for delivery of the SERVICES identified by the SERVICE PLAN PACKAGE described within this agreement contained in Schedule F in US Dollars." Schedule F, "Dedicated Support Service Costs," set forth the list of each type of employee, and the dedicated quantity of each, per month, that Server Sitters agreed to supply (*i.e.,* Tier 1, Tier 2, and Tier 3 agents, Technical Manager, and Specialized Departments), with the line-item cost per month for each type of employee, as described more fully above.

37.     LTM agreed, in Section 5.4 of the February 2016 Agreement, to make payment to Server Sitters on a "monthly basis to be deposited to Server Sitters, LLC" on a designated due date. Section 5.4 provided that seven days after the passage of the designated due date, Server Sitters would charge LTM 2% interest on all outstanding balances, and if an invoice was overdue by more than seven days, "an automatic 5% late fee w[ould] be applied." LTM paid Server Sitters' invoices for the invoiced amount in a timely fashion. (Indeed, per Server Sitters' request, LTM paid Server Sitters invoices for dedicated customer support services *in advance* for the upcoming month's yet-to-be-performed services, for the duration of the Agreement.) LTM complied with all of the terms of the Agreement and fully performed its contractual obligations under the Agreement.

38.     Server Sitters never complied with the February 2016 Agreement's terms regarding staffing, thereby breaching Section 2.0 and Schedules A through G of the Agreement: Server Sitters did not supply twenty-seven Tier 1 agents dedicated to resolving customer service tickets, four Tier 2 agents to support them directly, one Technical Manager, two "Senior Tier 3" agents dedicated to quality assurance and technical support, and ten agents dedicated to social media and

customer retention.  Rather, Server Sitters simply billed an indiscriminate number of agents against the Agreement without any regard for the contract terms, without any regard to the specific and particularized personnel called for by the Agreement, *and without regard to whether or not those agents performed any work on the LTM contract at all or performed any meaningful amount of customer service work for PIA.*[1]  For instance, for March 2016, the first effective month of the February 2016 Agreement, Server Sitters billed LTM for forty-one Tier 1 agents ($123,438.70); one "Dedicated Support Manager" ($3,852.24); dedicated server monitoring ($750); *double* billed it for a *single* Tier 2 agent ($7,895.16); and charged 5% overhead ($6,763.81).  It then applied a $9,758.43 "discount" (approximately 7%) to the March invoice, for a total of $133,031.48.  Following this first month under the February 2016 Agreement, Server Sitters *applied no discounts to any of the other thirteen invoices it submitted to LTM under the February 2016 Agreement*, in express violation of the "Schedule G SLA Term Discount."  Given that the Agreement was for a twenty-four month term, Server Sitters was contractually required to apply a 10% discount to each monthly invoice.  It did not do so, thereby breaching Schedule G of the Agreement and overcharging LTM for thirteen months.

39.    Server Sitters never even had enough staff to supply the full amount of support required by the February 2016 Agreement.  Nor did Server Sitters ever bother to comply with the Agreement's terms about the particular qualifications and responsibilities of the personnel required.  Rather, for a number of months, Server Sitters simply billed LTM for between thirty-four and forty-one Tier 1 agents.  Server Sitters never supplied more than one Tier 3 agent, despite

---

[1] For example, in most instances of over-charges, Server Sitters billed LTM for customer service agents who never even logged into the customer service database in a given month and thus performed zero PIA customer service-related work.  But in some instances, Server Sitters billed for a given agent who had ostensibly worked a full month on PIA customer service issues, when in fact that agent opened less than ten customer service tickets for the entire month—a miniscule amount that could not conceivably reflect a month's worth of full forty-hour work weeks performing PIA customer support.

the contractual requirement that it supply two, dedicated Tier 3 agents each month for the full twenty-four month term of the Agreement. And, similarly, each month, Server Sitters supplied only two of the contractually required four Tier 2 agents. Server Sitters only supplied one Tier 2 agent in March 2016.

40. Despite Server Sitters' contractual failings to supply the full amount of required and particularly qualified personnel under the contract, the Server Sitters invoices issued under the February 2016 Agreement fell within the broad contractual "Total of 44 reps and Cost (per month): $141,899.57 USD plus per incident costs (if applicable)" set forth in Schedule F. (emphasis omitted). In other words, although Server Sitters seemed to be supplying an inordinate number of Tier 1 agents (only twenty-seven were contractually required) and failed to supply the more skilled personnel required by the contract (*e.g.,* the contractually mandated Tier 2 agents, Tier 3 Quality Assurance agents, and Technical Manager), during the term of the February 2016 Agreement, Server Sitters did not bill in excess of 45 people total or in excess of the (improperly non-discounted) total of $141,899.57 per month. Thus, LTM had no reason to believe that Server Sitters would be so egregious and brazen as to invoice and receive payment from LTM for personnel who performed zero customer service support work, or a barely measurable amount, despite being billed for a full month's work.

41. After terminating the February 2016 Agreement for cause, LTM became concerned that the problems with the other aspects of the Agreement might have extended to the invoices. As a result, LTM conducted a review of the customer support database used by Server Sitters' employees to respond to PIA customer inquiries in order to audit the number of Server Sitters' employees who had actually performed work in a given month and to determine how many

customer support tickets those employees worked on.  Through that audit, LTM uncovered Server Sitters' fraudulent overcharges.

42.    Under the February 2016 Agreement, Server Sitters billed the following support service costs:

    a.  March 2016:   $133,031.48 (41 Tier 1 agents, 1 Tier 2 agent (though LTM was charged twice for that single agent), and 1 support manager)

        i.  Despite Server Sitters invoicing LTM for 43 individuals, according to records from the customer service database, only 24 individuals worked on PIA customer support at all or in any meaningful amount in March 2016.

    b.  April 2016:    $133,873.41 (41 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent (billed at over $1,000 above the contractually-agreed rate), and 1 support manager)

        i.  Despite Server Sitters invoicing LTM for 45 individuals, according to records from the customer support database, only 35 individuals worked on PIA customer support at all or in any meaningful amount in April 2016.

    c.  May 2016:    $133,873.41 (41 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent (billed at over $1,000 above the contractually-agreed rate), and 1 manager)

        i.  Despite Server Sitters invoicing LTM for 45 individuals, according to records from the customer support database, only 38 individuals worked on PIA customer support at all or in any meaningful amount in May 2016.

    d.  June 2016:    $128,873.41 (41 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

        i.  Despite Server Sitters invoicing LTM for 44 individuals, according to records from the customer support database, only 33 individuals worked on PIA customer support at all or in any meaningful amount in June 2016.

    e.  July 2016:    $123,454.15 (39 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

        i.  Despite Server Sitters invoicing LTM for 42 individuals, according to records from the customer support database, only 32 individuals worked on PIA customer support at all or in any meaningful amount in July 2016.

    f.  August 2016:  $118,034.89 (37 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

        i.  Despite Server Sitters invoicing LTM for 40 individuals, according to records from the customer support database, only 31 individuals worked on PIA customer support at all or in any meaningful amount in August 2016.

    g.  Sept. 2016:    $109,156.00 (34 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

        i.  Despite Server Sitters invoicing LTM for 37 individuals, according to records from the customer support database, only 30 individuals

worked on PIA customer support at all or in any meaningful amount in September 2016.

h. Oct. 2016:    $114,475.26 (36 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

    i. Despite invoicing LTM for 39 individuals, according to records from the customer support database, only 31 individuals worked on PIA customer support at all or in any meaningful amount in October 2016.

i. Nov. 2016:    $114,575.26 (36 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

    i. Despite invoicing LTM for 39 individuals, according to records from the customer support database, only 30 individuals worked on PIA customer support at all or in any meaningful amount in November 2016.

j. Dec. 2016:    $114,575.26 (36 Tier 1 agents, 2 Tier 2 agents, and 1 manager)

    i. Despite invoicing LTM for 39 individuals, according to records from the customer support database, only 29 individuals worked on PIA customer support at all or in any meaningful amount in December 2016.

k. Jan. 2017:    $123,994.52 (38 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent, and 1 manager)

   i. Despite invoicing LTM for 42 individuals, according to records from the customer support database, only 29 individuals worked on PIA customer support at all or in any meaningful amount in January 2017.

  l. Feb. 2017: $123,994.52 (38 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent, and 1 manager)

   i. Despite invoicing LTM for 42 individuals, according to records from the customer support database, only 31 individuals worked on PIA customer support at all or in any meaningful amount in February 2017.

  m. March 2017: $132,512.30 (41 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent, and 1 manager)

   i. Despite invoicing LTM for 45 individuals, according to records from the customer support database, only 33 individuals worked on PIA customer support at all or in any meaningful amount in March 2017.

  n. April 2017: $132,512.30 (41 Tier 1 agents, 2 Tier 2 agents, 1 Tier 3 agent, and 1 manager)

   i. Despite invoicing LTM for 45 individuals, according to records from the customer support database, *no* individuals worked on PIA customer support at all or in any meaningful amount in April 2017.

43. Although Server Sitters invoiced for between thirty-four and forty-one Tier 1 agents for fourteen straight months under the February 2016 Agreement, far fewer agents actually worked

on providing PIA with customer service support in a given month, as demonstrated by the figures above.  In its invoices to LTM, Server Sitters intentionally misled LTM about how many agents provided customer service support to PIA, by a *minimum* of seven agents per month, fraudulently billing LTM over $500,000 for work never performed.

44.     In addition to utterly failing to meet its staffing obligations under the February 2016 Agreement and fraudulently over-charging LTM for employees that never performed work for PIA under that contract, Server Sitters also materially failed to perform under the February 2016 Agreement in other ways.  LTM regularly communicated to Server Sitters that it was not performing its contractual obligations.

45.     Most notably, in February 2017, LTM's head of Customer Support, Jayson Quayle, and Chief Financial Officer, Alex Lee, conducted a week-long site visit to Server Sitters' Prince Edward Island offices to personally address Server Sitters' contractual performance failings.

46.     Mr. Quayle and Mr. Lee met with Server Sitters' Customer Service Operations Manager, Technical Operations Manager, Chief Operations Officer, and other Server Sitters employees, and reported to them about a number of Server Sitters' ongoing breaches of the February 2016 Agreement, including the fact that Server Sitters customer service agents were missing work hours (for which Server Sitters was not reimbursing LTM as required by the Agreement); that Server Sitters was hiring agents who lacked the requisite qualifications and were not presenting those individuals for prior hiring approval to LTM as required by the Agreement; that Server Sitters staff was not adequately trained to perform the customer support services mandated by the Agreement; and that Server Sitters was not meeting its contractually-required weekly and monthly reporting requirements to LTM.  At the weeklong site visit, LTM put Server

Sitters on notice that it had been and was in breach of the following provisions of the February 2016 Agreement, among others:

    a.  Section 2.0 and Schedules A through G of the Agreement:  For failing to provide the requisite personnel and provide them for the number of hours required by the Agreement;

    b.  Section 2.8 of the Agreement: for failing to compensate LTM when Server Sitters' agents called in sick, did not show up for work, or were for some other reason absent from their shift without Server Sitters providing a replacement agent to cover missing shifts;

    c.  Schedule D of the Agreement:  for failing to monitor Server Sitters' agents to ensure that pre-determined standards of service were being consistently met; for failing to coach/train staff in areas where improvement or change was necessary; and for failing to provide time clock stats and a weekly schedule to LTM regarding all current and future agent shifts and reflecting, in the weekly schedule, anticipated agent absences and substitutions, and a list of "on-call" agents to account for unanticipated absences;

    d.  Schedule G of the Agreement: for failing to ensure that all staff underwent two weeks of mandatory network training and two weeks of mandatory customer service training at Server Sitters' sole expense;

    e.  Schedule F of the Agreement: for failing to provide the number of Dedicated Quality Assurance personnel required by the Agreement;

    f.  Schedule G of the Agreement: for failing to provide new office space for Server Sitter employees to work in a habitable environment; for failing to

make certain infrastructure enhancements expressly agreed upon in the Agreement; for failing to involve LTM in the hire of new agents, failing to notify LTM, in advance, of the prospective new hires' skills, failing to provide LTM with resumes and/or work histories of prospective new hires, and failing to provide LTM the right to refuse permission for a given prospect to work on the LTM contract;

g. Section 2.8 of the Agreement: for allowing Server Sitters employees to work remotely, from home, when Server Sitters was aware that the very purpose of PIA's business is to provide its clients with private and secure Internet access, and Section 2.8 expressly required Server Sitters to reimburse LTM for agents who "call in sick," do "not *show up* to their shift," or are "absent" for "*some other reason*." (emphasis added).

47.     During the week-long site visit, Server Sitters personnel expressly acknowledged these and other contractual failings and represented that Server Sitters would remedy them.  Server Sitters did not address and/or remedy these breaches despite its explicit representations that it would do so.

48.     Due to Server Sitters' multiple material breaches (of which LTM put Server Sitters on notice despite having no contractual obligation to do so) and Server Sitters' extended failure to address any of those breaches, on April 30, 2017, LTM lawfully terminated the Agreement for cause pursuant to Section 7.3(i) of the Agreement, which states that the Agreement "may be terminated by London Trust Media, Inc. immediately upon a material breach thereof by Server Sitters, LLC."  In its written termination letter, LTM reiterated the above-listed breaches that

Server Sitters had long been committing and failed to correct despite LTM giving it extensive (and contractually unrequired) opportunities to do so.

49.     LTM brings this action for breach of the February 2016 Agreement, for fraud, and for conversion.

## COUNT I
## BREACH OF CONTRACT

50.     LTM realleges and incorporates by reference paragraphs 1 through 49 as if set forth herein.

51.     LTM and Defendant Server Sitters executed a signed Service Level Agreement on or about February 18, 2016.

52.     Under the February 2016 Agreement, Defendant Server Sitters contracted to provide a specific number of specifically qualified customer service personnel and provide them for the number of hours required by the Agreement; to compensate LTM when Server Sitters' agents called in sick, did not show up for work, or were for some other reason absent from their shift without Server Sitters providing a replacement agent to cover missing shifts; to monitor Server Sitters' agents to ensure that pre-determined standards of service were being consistently met; to coach/train staff in areas where improvement or change was necessary; to provide time clock stats and a weekly schedule to LTM regarding all current and future agent shifts and reflect, in the weekly schedule, anticipated agent absences and substitutions, and list of "on-call" agents to account for unanticipated absences; to ensure that all Server Sitters staff underwent two weeks of mandatory network training and two weeks of mandatory customer service training at Server Sitters' sole expense; to provide the number of Dedicated Quality Assurance personnel required by the Agreement; to make certain infrastructure enhancements, at Server Sitters' sole expense, expressly-agreed upon in the Agreement; to involve LTM in the hiring of any and all new agents

and to notify LTM in advance of all prospective new hires' skills; to provide LTM with resumes and/or work histories of prospective new hires and provide LTM the right to refuse a given prospect to work on the LTM contract for PIA customer support.

53.     LTM performed all of its obligations to Server Sitters under the February 2016 Agreement, including making timely payment of all Server Sitters' invoices.

54.     Server Sitters breached its contractual obligations by, among other things, failing to meet each of the contractual obligations of the February 2016 Agreement enumerated in paragraphs 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 36, 37, 42, 43, and 44 above.  As a result, LTM paid for services that it never actually received from Server Sitters.

55.     Server Sitters also breached the February 2016 Agreement by failing to return all LTM property, including any and all back-ups of the Kayako or Zendesk customer service databases and any and all data related to any PIA customer lists or customer information, despite Schoolfield's May 12, 2017 sworn Declaration to the contrary.  In fact, Schoolfield possesses, as of the time of filing this Complaint, "a complete copy of [PIA's] support client list and all help desk tickets"; "a full [K]ayako helpdesk backup"; and PIA "data on hundreds of thousands of clients."

56.     LTM was also damaged by Server Sitters' breaches of the February 2016 Agreement to the extent that Server Sitters' failure to provide a sufficient number of personnel and adequately trained customer support agents as required by the February 2016 Agreement damaged PIA's business reputation, its ratings in relevant industry publications, and its goodwill, and/or caused it to lose customers.

57.     As a result of Server Sitters' breach of its contractual obligations, LTM has suffered and will continue to suffer damages.

28

## COUNT II
## <u>FRAUD</u>

58.     LTM realleges and incorporates by reference paragraphs 1 through 57 as if set forth herein.

59.     LTM and Defendant Server Sitters executed a written Service Level Agreement on or about February 18, 2016.

60.     Under the February 2016 Agreement, Server Sitters contracted to provide LTM, each month, among other things, 27 dedicated Tier 1 agents, a dedicated Team Lead Support agent, 4 dedicated Tier 2 agents, 2 Senior Tier 3 Technical Quality Assurance Support agents, and a "Specialized Department," consisting of 4 "Social Media and Retention Agents" and 6 Supervisors.

61.     For every single month that the February 2016 Agreement was in force, Server Sitters intentionally and knowingly invoiced LTM for more than the number of agents that actually provided any customer support services whatsoever to PIA and intentionally and knowingly invoiced LTM for agents who failed to provide any significantly measurable or remotely meaningful customer support services to PIA.  LTM relied on the fraudulent invoices, paying them promptly and in full.

62.     The February 2016 Agreement required LTM to pay Server Sitters' invoices, on a monthly basis, by an agreed-upon date.  Any invoices that LTM did not timely pay were subject to substantial late penalties.  LTM had no reason to believe that Server Sitters was fraudulently charging LTM for Server Sitters employees who performed zero to miniscule amounts of work in nearly every invoice submitted under the February 2016 Agreement, given that, in its invoices, Server Sitters generally *billed for* (but, unbeknownst to LTM, never *supplied*) a total number of personnel that was consistent with the total number of personnel required to be supplied each

month under the February 2016 Agreement.  Therefore, LTM had no reason to believe that Server

Sitters was fraudulently charging for large numbers of personnel who performed no or nearly no

work.  Thus, LTM reasonably relied on the invoices when it paid them in full, believing them to

be truthful.

63.     As a result of Server Sitters' intentionally false representation of material facts, and

LTM's reliance on those false representations, LTM has suffered damages.

**COUNT III**
**CONVERSION**

64.     LTM realleges and incorporates by reference paragraphs 1 through 63 as if set forth

herein.

65.     LTM, at all times, has had an ownership right and right of possession in its PIA

client data (whether in original or "back-up" form), including its PIA client list and/or PIA

customer database; the list of any and all PIA clients who have ever reached out to LTM, PIA,

and/or Server Sitters for customer support; any and all "help desk tickets" reflecting support

inquiries made by PIA customers; any and all originals or back-ups of the customer service

software databases (*i.e.*, Kayako and Zendesk) used to conduct customer service support for PIA

customers; and, any identifying data on PIA clients that came into Server Sitters' possession,

custody, or control for the purpose of providing outsourced customer support services for LTM

pursuant to the February 2016 Agreement.

66.     Paul Schoolfield, the CEO of Defendant Server Sitters, falsely swore, under oath,

on May 12, 2017, that neither Server Sitters corporately nor Schoolfield individually possessed

any of LTM's data, including "customer service related data or information related to Server Sitters

performance of customer support services for London Trust from September 2012 through April

30

30, 2017, including any customer's true name, user name, physical address, email address, telephone number, social media identifier, payment information, or any other piece of information specific to a London Trust customer." He also falsely swore, under oath, that Server Sitters "destroyed" the Kayako server, and that neither Schoolfield individually or Server Sitters corporately ever stored any London Trust Data on any servers within its possession, custody, or control, and never made any "backups" of London Trust Data, or ever provided London Trust Data to third parties.

67.    Defendant Server Sitters, though its CEO, Paul Schoolfield, admitted in October 2017 that, contrary to earlier statements made under penalty of perjury, Server Sitters is, in fact, in possession of "a complete copy of [PIA's] support client list and all help desk tickets"; a "full [K]ayako helpdesk backup" of all of LTM's customer support data that was run through the Kayako software during Server Sitters' provision of outsourced customer support services to LTM; and "data on hundreds of thousands of [PIA] clients."

68.    In October 2017, Defendant Server Sitters tried to extort a cash payment from LTM in exchange for the above-described customer information (even though it already swore that it did not possess this information).

69.    Defendant Server Sitters is wrongfully exercising dominion and control over LTM's property; namely, "a complete copy of [PIA's] support client list and all help desk tickets"; a "full [K]ayako helpdesk backup" of all of LTM's customer support data that was run through the Kayako software during Server Sitters' provision of outsourced customer support services to LTM; and "data on hundreds of thousands of [PIA] clients."

70.    Defendant Server Sitters' wrongful exercise of dominion and control over LTM's property (namely, a "complete copy of [PIA's] support client list and all help desk tickets"; a "full

[K]ayako helpdesk backup" of all of LTM's customer support data that was run through the Kayako software during Server Sitters' provision of outsourced customer support services to LTM pursuant to the February 2016 Agreement; and "data on hundreds of thousands of [PIA] clients") is depriving Plaintiff LTM of possession of its property.

71.     As a result of Defendant Server Sitters' unlawful conversion of Plaintiff's property, Plaintiff has suffered and will continue to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, LTM requests that this Court:

1.     Enter Judgment in favor of Plaintiff on all counts;

2.     Award Plaintiff full damages and interest thereon;

3.     Award Plaintiff all attorneys' fees and costs incurred in this action;

4.     Award Plaintiff punitive damages based on Defendants' fraudulent conduct; and

5.     Award such other relief as the Court deems just and proper.

DATED: November 1, 2017

VENABLE LLP

By: /s/ _____
Courtney A. Sullivan (VSB # 43244)
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.344.4000
Facsimile: 202.344.8300
E-Mail: CASullivan@Venable.com

Kimberly Culp Cloyd (*Pro Hac Vice to be filed*)
VENABLE LLP
505 Montgomery Street, Suite 1400
San Francisco, CA 94111
Telephone: 415.653.3750
Facsimile: 415.653.3755
E-Mail: KCulp@Venable.com

*Attorneys for Plaintiff London Trust Media, Inc.*